IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ZOKAITES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| CITY OF PITTSBURGH, | ) | |
| BRIAN MARTIN, individually and in his official | ) | ELECTRONICALLY FILED |
| Capacity as a Pittsburgh Police Officer, | ) | |
| DAVID HONICK, individually and in his official | ) | |
| Capacity as a Pittsburgh Police Officer, | ) | |
| BRIAN BURGUNDER, individually and in his | ) | |
| Official capacity as a Pittsburgh Police Officer, | ) | |
| DAVID LINCOLN, individually and in his official | ) | |
| Capacity as a Pittsburgh Police Officer, THE CITY | ) | |
| OF PITTSBURGH FRATERNAL ORDER OF | ) | |
| POLICE and | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## COMPLAINT

**AND NOW**, comes Plaintiff MICHAEL ZOKAITES, by and through his attorney, Wendy L. Williams, Esquire, and submits the following Complaint and in support thereof avers as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. §1983, 1331, 1343 and under 18 U.S.C. § 1964(a);(c)(RICO). Plaintiff further raises claims under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. This court has pendent jurisdiction over Plaintiff's state claims vested in the laws of the Commonwealth of Pennsylvania.

1

## PARTIES

2.      Plaintiff, Michael Zokaites, is an adult individual residing in Allegheny County within the Commonwealth of Pennsylvania and the Western District of Pennsylvania.

3.      The City of Pittsburgh is a municipality within the Commonwealth of Pennsylvania with a principal place of business located at 414 Grant Street, Pittsburgh, Pennsylvania 15219, which, at all times relevant hereto, was authorized to and did operate and maintain a police department.

4.      At all times relevant hereto, Defendant City of Pittsburgh was acting by and through its duly-authorized agents, employees and/or assigns, its appointed Bureau of Police, Chiefs of Police, and Command Staff officials, including Deputy Chiefs, Assistant Chiefs and Commanders who were then and there acting in accordance with custom, policies and/or practices of the City of Pittsburgh Bureau of Police and who were acting within the course and scope of their employment and under the color of state law.

5.      At all times relevant hereto, and prior to the events in this case, the Defendant City of Pittsburgh was on notice of repeated instances of City of Pittsburgh police officers using unnecessary and/or excessive force, and then initiating false criminal charges to justify the use of such force and/or otherwise filing false Affidavits of Probable

Cause, including prior instances by Defendants Honick, Martin, Burgunder, Lincoln and others and/or their subordinates, and despite such knowledge failed to take appropriate action, including but not limited to, referral for criminal prosecution, appropriate discipline, and/or retraining.

6.       Defendant Martin is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh.

7.       Defendant Honick is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh.

8.       Defendant Burgunder is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh.

9.       Defendant Lincoln is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City

of Pittsburgh.

10.     Defendant, City of Pittsburgh Fraternal Order of Police, is a formal business union located within the City of Pittsburgh whose primary purpose is organize, guide and protect the interests of its member police officers employed by the City of Pittsburgh.    All individual defendants set forth above are members of the City of Pittsburgh Fraternal Order of Police.


## STATEMENT OF CASE

11.     On the evening of October 11, 2018, and the early morning of October 12, 2018, Plaintiff was at Kopy's Bar in the Southside Section of the City of Pittsburgh with friends Frank Deluca, Erik Heitzenrater, Bruce Thomas and two other people.

12.     Deluca and Zokaites entered Kopy's Bar at approximately 11:41 p.m. on October 11, 2018. They walked up to the bar area and each of them ordered a drink.

13.     As Deluca and Zokaites entered Kopy's Bar, Defendants Martin, Honick, Burgunder and Lincoln were seated at the corner of the bar near the front door of the establishment.

14.     Defendants Martin, Honick, Burgunder and Lincoln had been in Kopy's Bar consuming alcohol from as early as 7:33 p.m. on October 11, 2018.

15.     Defendants, Martin, Honick, Burgunder and Lincoln were on duty as Pittsburgh Police officers while they were consuming alcohol at Kopy's Bar.

16.     The City of Pittsburgh was paying for Defendants, Martin, Honick, Burgunder and Lincoln alcohol during this time.

17.     As a result of the City of Pittsburgh paying for this consumption of alcohol, the City of Pittsburg was providing alcohol to on duty police officers, namely Defendants,

Martin, Honick, Burgunder and Lincoln.

18.     As Deluca and Zokaites were ordering drinks, Defendant Honick turned to his right and looked at them.

19.     Defendant Honick leaned back on his bar stool and specifically looked at the back of the vests Deluca and Zokaites were wearing and he noticed the vests were associated with the Pagan's Motorcycle Club.

20.     From that point forward, Defendant Honick appeared to have some sort of fascination with Deluca and Zokaites.

21.     After obtaining their drinks, Deluca and Zokaites walked to the rear of the bar to a back room to play pool.

22.     Within a minute, Erick Heitzenrater walked into Kopy's Bar, ordered a drink.

23.     Defendant Honick looked at Heitzenrater and his vest and then turned toward Defendants Burgunder, Martin and Lincoln and said something to them.

24.     Within a minute, two other friends of Plaintiff wearing vests similar to those worn by Plaintiff, Deluca and Plaintiff walked into Kopy's Bar and ordered drinks. Plaintiff was in the backroom of the bar playing pool with Deluca.

25.     Defendant Honick then attempted to make conversation with Plaintiff's two friends that were ordering drinks. Defendant Honick shook hands with these friends and began a brief conversation that lasted a few minutes.

26.     At approximately 11:46 p.m., Bruce Thomas walked into the bar and stood near the other two friends who were speaking with Defendant Honick.

27.     Shortly thereafter, Thomas and Plaintiff's other two friends walked to the rear back room of Kopy's Bar to play pool. The Plaintiff and his friends were alone in the

back room at this time.

28.     Between 11:48 p.m. on October 11, 2018 and 12:31 a.m. on October 12, 2018, Plaintiff and his friends remained in the rear area of the bar, keeping to themselves.

29.     At approximately 12:21 a.m., Defendant Honick stood up from his bar stool up and reached across to the bartender by grabbing the back of his head and pulling the bartender's head toward his mouth.

30.     Defendant Honick at this time quietly advised the bartender that he and Defendants Martin, Burgunder and Lincoln were police officers and there was going to be a problem with Plaintiff and his friends because they were members of the Pagan's Motorcycle Club and he (the bartender) didn't understand what was going on inside the bar.

31.     Defendant Honick falsely told the bartender that Plaintiff and his friends were staring at Defendants Honick, Burgunder, Lincoln and Martin. The bartender responded to Defendant Honick that Plaintiff and his friends weren't causing any trouble and he didn't witness any pointing or staring.

32.     After his conversation with the bartender, Defendant Honick appeared agitated and continued to rub his face.

33.     At approximately 12:22 a.m. Defendant Martin and Defendant Burgunder went into the bathroom of the bar.

34.     At approximately 12:23 a.m. Zokaites walked to the middle bar area and ordered another drink.  He immediately returned to the rear bar area without speaking to any of the detectives.[1]

35.     At approximately 12:24 a.m., Defendants Martin and Burgunder exited the

---

[1] Plaintiff had a total of two (2) beers throughout the course of this evening.

bathroom. Upon leaving the bathroom, Defendant Martin walked to the rear area of the bar and began to speak with Plaintiff's friends. Defendant Burgunder returned to his seat at the bar.

36.     Defendant Martin shook hands with Plaintiff and his friends. Immediately after shaking their hands, he raised both of his hands in the air and walked back to his seat at the bar. On his way back to his seat, he again raised his hands and made a gesture as though he was exhibiting a sign of strength.

37.     Less than a minute after leaving the rear area of the bar, Defendant Martin immediately went back to that area. He again shook hands with a few of Plaintiff's friends and engaged in some conversation.

38.     Defendant Burgunder followed Defendant Martin to the rear area of the bar. Defendant Burgunder took a seat near the rear area of the bar and monitored Defendant Martin's conversation with Plaintiff's friends.

39.     One of Plaintiff's friends briefly joined Defendant Burgunder and had a brief conversation.

40.     Defendant Burgunder was joined by Defendant Lincoln near the rear area of the bar as they stood in close proximity to Defendant Martin.

41.     At approximately 12:28 a.m. Defendant Burgunder joined Defendant Martin in the rear room of the bar and conversed with Plaintiff and his friends.

42.     At approximately 12:29 a.m., Defendant's Martin, Lincoln and Burgunder returned to the front area of the bar near the seats they had been originally sitting in.

43.     At approximately 12:31 a.m., two of Plaintiff's friends left the bar and did not return. One of them waved to the undercover detectives on his way out of the bar. A

few of the undercover detectives waved back.

44.     At approximately 12:32, Deluca and Plaintiff Zokaites, walked to the middle area of the bar. Deluca was on the telephone at this time.

45.     Deluca and Zokaites walked outside so Deluca could finish his telephone call.

46.     As Deluca and Zokaites walked toward the middle area of the bar, Defendant Honick stood up from his bar stool. He was unsteady on his feet and held onto the bar to help him stand.

47.     Deluca and Zokaites returned to the bar.

48.     Deluca was looking at his phone as he walked back into the bar.

49.     At approximately 12:33 a.m., Deluca and Zokaites walked back into the bar and stood at a table in the middle bar area.

50.     Defendant Honick turned toward Deluca and Zokaites and began staring at them.

51.     Defendant Martin, for the third time, approached one of Plaintiff's friends, this time Zokaites, and shook his hand. Martin was somewhat animated and again raised his hands above his head.

52.     As Defendant Martin walked away from Zokaites, Defendant Honick turned and began staring directly at Zokaites.

53.     Zokaites stood next to Deluca who was preoccupied on his cell phone.

54.     Zokaites walked back to the rear area of the bar.

55.     Zokaites shortly returned to the middle area of the bar.

56.     At approximately 12:35 a.m., Deluca and Zokaites returned to the rear area

of the bar without having any interaction with Defendant Honick.

57.    Between approximately 12:33 a.m. and 12:35 a.m., Defendant Honick continued to stare at Deluca and Zokaites.

58.    At approximately 12:34 a.m., Defendant Lincoln left the bar and went outside.

59.    At approximately 12: 36 a.m., and after Deluca and Zokaites walked to the rear of the bar, Defendant Honick conversed with the bartender in an animated manner and repeatedly and aggressively gestured toward Plaintiff and his friends in the rear of the bar.

60.    At approximately 12:36 a.m., Deluca and Zokaites returned to the middle area of the bar.

61.    Immediately, Defendant Honick turned directly toward Deluca and Zokaites from a distance of a few feet away, lifted his shirt and intentionally exposed a firearm to Deluca and Zokaites that was tucked into his waistband.

62.    Deluca and Zokaites attempted to ignore Defendant Honick but Defendant Honick began speaking directly to Deluca and Zokaites in an aggressive fashion and he continued to exhibit his gun to Deluca and Zokaites.

63.    For the first time, at approximately 12:37 a.m. Deluca and Zokaites responded to Defendant Honick.

64.    At approximately 12:37 a.m., Defendant Lincoln returned to the bar and covertly handed a loaded handgun magazine to Defendant Burgunder.

65.    At this time, Detective Lincoln placed a handgun in his waistband or rear pocket.

66.    At approximately 12:39 a.m., Defendant Lincoln intervened and attempted to

calm Defendant Honick. Detective Lincoln extended his hand and shook Deluca's hand.

67.     Deluca attempted to shake Defendant Honick's hand. At first, Defendant Honick did not want to shake but he eventually did shake Deluca's hand again.

68.     Immediately after shaking Deluca's hand, Defendant Honick continued to argue with Deluca while having his hand on his gun.

69.     Defendant Honick continued to get animated with Deluca.

70.     At approximately 12:40 a.m., all four Defendants stood next to each other blocking the front door of the bar.

71.     Defendant Honick continued to argue with Deluca and Detective Martin began yelling in the direction of Deluca and Zokaites.

72.     At approximately 12:40 a.m., Defendant Honick placed his hand on Deluca's vest while yelling at him.

73.     At approximately 12:41 a.m., Defendant Honick again placed his hand on Deluca's vest while yelling at him.

74.     At approximately 12:42 a.m. Deluca and Defendant Honick faced off and began yelling at each other.

75.     Immediately thereafter, two uniformed police officers walk into Kopy's Bar and walked right by Defendant Honick and Deluca as they were yelling at each other.

76.     Just as the officers enter the bar, Deluca pushed Defendant Honick away from him.

77.     At this point, Defendant Martin immediately grabbed Deluca by his hair and began pulling it.

78.     At the same time, Defendant Burgunder and a uniformed officer also

grabbed Deluca and attempted to pin him against the bar.

79.     After being pushed, Defendant Honick stumbled and fell to the floor.

80.     As Defendant Honick got back on his feet, a uniformed police officer attempted to grab him and pull him away from the melee that had developed.

81.     Instead  of  complying with the uniformed officers, command, Defendant Honick pushed the uniformed officer away from him and joined the assault of Deluca.

82.     Defendant Martin, without any provocation, violently threw off Plaintiff Zokiates' glasses throwing them behind Defendant Martin.

83.     Zokaites attempted to come to Deluca's aid but he was twice tased and fell to the ground.

84.     Upon falling to the ground, Plaintiff Zokiates was dosed with pepper spray by Defendant Martin and Defendant Burgunder.

85.     After Zokaites fell to the floor, he yelled "I'm done, I'm done" and he immediately became compliant with Defendants demands.

86.     Despite Plaintiff Zokiates' compliance, Defendant Martin and or other Defendants continued to employ pepper spray upon Plaintiff's face and head area and completely saturated Plaintiff's vest with pepper spray.

87.     As Plaintiff Zokaites was being tased, Defendant Martin further punched Plaintiff Zokiates in the back of his head as lay on the ground defenseless.

88.     Defendant Martin then turned his attention to Thomas, who was standing near a table.

89.      Defendant Martin grabbed Thomas screaming "get out of here bitch" and he

threw Thomas into some bar stools.

90.    While Deluca was being assaulted by Defendant Lincoln and Defendant Burgunder, Defendant Honick approached Plaintiff who was standing next to the table at which Plaintiff had been sitting.

91.    Defendant Honick squared off toward Plaintiff and raised his hand as though he was going to punch Plaintiff.

92.    Plaintiff vanished his hands above his head displaying the fact that his left hand was in a splint and indicating that he did not want to fight Defendant Honick.

93.    Defendant Honick turned away and began punching Deluca along with Defendant Lincoln while Deluca was being restrained by Defendant Burgunder.

94.    At approximately 12:42 a.m., Defendant Martin rushed toward Heitzenrater and without any provocation yelled "and fuck you too" and violently punched Heitzenrater two times in the head.

95.    Heitzenrater immediately fell to the ground.

96.    Uniformed officers approached Defendant Martin immediately after he punched Heitzenrater the second time.

97.    Defendant Martin began yelling "I'm a cop! I'm a cop!" to the uniformed officers.

98.    While Heitzenrater was lying on the ground with his hands in the air, Defendant Martin hovered over Heitzenrater yelling at him and screaming "man, you're a fucking bitch! You're a fucking bitch".

99.    Heitzenrater told Defendant Martin "I didn't do nothing'.

100.    Defendant Martin responded by falsely claiming Heitzenrater grabbed him

yelling "Yeah you did! Fuckin' grab onto me again!"

101.    Heitzenrater responded by telling Martin that he didn't touch him.

102.    Defendant Martin responded by saying "the fuck you didn't".

103.    Defendant Martin ordered Heitzenrater to roll over.

104.    Heitzenrater responded by telling Defendant Martin that he had a broken hand.

105.    Defendant Martin responded by yelling "I don't give a fuck" and he forcefully grabbed Heitzenrater and rolled him over.

106.    While Heitzenrater was lying on the ground, Defendant Martin then grabbed Thomas and, without any provocation, again threw him violently to the ground.

107.    Video surveillance clearly shows that Heitzenrater never grabbed Defendant Martin, or anyone else or that engaged in any aggressive behavior on October 12, 2018.

108.    Defendant Martin grabbed Plaintiff around his neck and threatened him while Plaintiff was lying on the ground in handcuffs.

109.    While Defendant Martin was assaulting Plaintiff and Thomas, Defendant Burgunder held onto Deluca while Defendant Lincoln and Defendant Honick began to punch Deluca in the head.

110.    While they were assaulting Deluca, a uniformed officer began spraying pepper spray at Defendants Honick, Burgunder and Lincoln.

111.    Despite the fact that they were pepper sprayed by uniformed police officers, Defendants Burgunder and Lincoln continued to assault Deluca.

112.    Defendant Burgunder restrained Deluca against the bar. Defendant Lincoln then violently punched Deluca approximately 19 times in the head while uniformed officers

looked on.

113.     During the incident, Defendant Honick attempted to retrieve his firearm from his waistband, however, he appeared too intoxicated to remove the firearm.

114.     Additional officers, both uniformed and plainclothes, arrived on scene.

115.      Defendant Honick was then restrained as he was staggering and attempting to stand.

116.     One of the additional officers, a plainclothes officer, joined in the assault of Deluca and began kicking him.

117.     As Deluca was being assaulted, one of the officers screamed at Deluca to "feel it faggot, feel it!"

118.     The first indication that Defendants Martin, Honick, Burgunder and Lincoln were police officers was when Defendant Martin yelled that he was a cop.

119.     At the direction of Defendant Martin, uniformed officer then took Plaintiff into custody.

120.     Bar patrons recorded various portions of the events of October 12, 2018 on their cellular phones after Plaintiff, Deluca, Heitzenrater and Thomas were placed in custody, Defendant Martin looked directly into one of the bar patron's cellular phones and drunkenly slurred "I love being a cop."

121.     After Plaintiff Zokiates was taken into custody and transferred to the Mercy Hospital in order to purportedly? the pepper spray from Plaintiff, Defendant Martin again employed pepper about Plaintiff's face, neck and head causing additional unnecessary and unwarranted pain and suffering.

122.     Further Defendant Martin tightened Plaintiff Zokiates' handcuffs in a

fashion that is was difficult for hospital aids to remove them – causing addition unnecessary and unwarranted pain and suffering.

123.    After Plaintiff, Deluca, Heitzenrater and Thomas were taken into custody, police officers told the owner of Kopy's Bar that the incident occurred because he let "Pagans" in his bar and that he should no longer allow such people in the bar.

124.    Between 7:33 p.m. on October 11, 2018 and 12:40 a.m. on October 12, 2018, the following Defendants consumed the following amounts of alcohol while working in an undercover capacity at Kopy's Bar:

> a.    Defendant Honick – at least 13 drinks of liquor "on the rocks." The drinks contained double shots of alcohol at a minimum and some of the drinks contained triple shots of liquor;
>
> b.    Defendant Martin – at least 14 drinks comprising of a shot of liquor or can(s) of beer or another canned alcoholic beverage;
>
> c.    Defendant Burgunder – at least 19 drinks comprising of a shot of liquor, can(s) of beer or mixed drinks containing liquor; and
>
> d.    Defendant Lincoln – at least 7 drinks comprising of a shot of liquor, can(s) of beer and/or drinks containing single or double shots of liquor.

125.    It is averred, upon information and belief, that Defendants Honick, Martin, Burgunder and Thomas all collaborated after the arrests of Plaintiff, Deluca, Zokaites and Thomas to coordinate false stories to support the excessive forced used against Plaintiff, Deluca, Zokaites and Thomas and to support the arrests of those men.

126.    On October 12, 2018, less than 12 hours after the assaults of Plaintiff, Deluca, Heitzenrater and Thomas, Defendant Burgunder authored a patently false Affidavit

of Probable Cause in support of the Police Criminal Complaints filed against Plaintiff charging Plaintiff with:

     a.     RIOT in violation of 18 Pa.C.S. 501(1) – Felony 3;

     b.     Aggravated Assault – in violation of 18 Pa.C.S. 1702(A)(2) – Felony 1;

     c.     Criminal Conspiracy – in violation of 18 Pa.C.S. 903(A)(1).

127.    With respect to Plaintiff, the allegations of criminal conduct contained in the Affidavit of Probable Cause were limited to the following false allegations against Plaintiff:

> …Deluca than pushed Detective Honick, which started a physical confrontation that ZOKAITES immediately entered into. ZOKAITES punched both Detectives Lincoln and I [Burgunder] in the head/face area.

128.    At no time did Plaintiff "punch" any person let alone Detectives Lincoln and Burgunder.

129.    The false Affidavit of Probable Cause that was prepared by Defendant Burgunder intending it to appear as if Plaintiff was aggressive and violent toward Defendant Martin and Burgunder, all of which was false.

130.    These remaining false allegations set forth in the Affidavit of Probable Cause were intended to make it appear as if Deluca, Zokaites and Thomas were aggressive and violent toward the defendants in this case; which is patently false and fabricated.

131.    These false allegations against Plaintiff were further made for the purpose of justifying Defendant Martin's unnecessary and excessive use of force against the Plaintiff and Plaintiff's false arrest.

132.    These remaining false allegations set forth in the Affidavit  of Probable

Cause were further made for the purpose of justifying the unnecessary and excessive use of force against Deluca, Heitzenrater and Thompson and their subsequent false arrest.

133.    Plaintiff Zokiates, Deluca, Hietzenrater and Thomas were all arrested and lodged in the Allegheny County Jail in lieu of a $10,000 bond.

134.    Plaintiff Zokiates was held in the Allegheny County Jail for two (2) days having to suffer from the effects of pepper spray; causing additional unnecessary and unwarranted pain.

135.    At all relevant times, Defendants Martin, Burgunder, Honick and Lincoln were aware that there was a video which recorded the events of October 11, 2018 and October 12, 2018 including, but not limited to, Martin's unprovoked attack on Plaintiff.

136.    On October 19, 2018, officials from the City of Pittsburgh Bureau of Police seized the video surveillance hard drive from Kopy's Bar.

137.    When officials from the City of Pittsburgh Bureau of Police returned the hard drive to the owner of Kopy's Bar, those officials advised the owner that the hard drive could not be turned on and that the data from the hard drive might be lost.

138.    Officials from the City of Pittsburgh were not aware that Plaintiff's legal counsel had already obtained a copy of the video surveillance.

139.    It is respectfully averred that representatives from the City of Pittsburgh Bureau of Police intentionally destroyed evidence relating to a criminal case.

140.    After the video of the October 11-12, 2018 events surfaced, the Allegheny County District Attorney's Office voluntarily withdrew all charges filed against the Plaintiff, Deluca, Zokaites and Thomas on November 14, 2018.

141.    The District Attorney of Allegheny County was interviewed on local media

on November 18, 2018 and has specifically stated that he did not believe Plaintiff committed any crimes on October 12, 2018.

## NOTICE AND ACQUIESCENCE ALLEGATIONS

142.     Prior to the events of October 12, 2018, Defendant City of Pittsburgh was on notice that City of Pittsburgh police officers including Defendants had, without cause, escalated nonviolent interactions with citizens resulting in the unnecessary and excessive use of force, sometimes while drinking alcohol to excess. The officers then filed false criminal charges to justify the use of such unnecessary force, and to protect themselves from civil liability, by attempting to obtain plea-bargains in the face of defending against serious, often felony-level, false criminal charges.

143.     Despite knowledge of such unconstitutional practices on the part of City of Pittsburgh police officers, Defendant City of Pittsburgh failed to take any action to prevent officers from engaging in such unconstitutional conduct. Officers who had engaged in such practices were not punished and, in many instances, were promoted to a higher rank. Prior to October 12, 2018, Defendant City of Pittsburgh had reason to know and was otherwise on notice of a number of instances where City of Pittsburgh police officers had used unnecessary and excessive force and filed false serious criminal charges to justify such force. Those instances include, but are not limited to, the following instances:

### David Williams v. City of Pittsburgh, et al

144.     On September 1, 2014, David Williams, a Pennsylvania State Police trooper, was arrested and charged with serious felony offenses, including aggravated

assault on police officers.

145.    In support of those charges, several City of Pittsburgh police officers, in official documents, including Affidavits of Probable Cause, incident reports, and supplemental reports, made allegations which were later shown to be false by a video which recorded the actual events.

146.    At all times relevant, Defendant City of Pittsburgh and/or members of the Command Staff viewed the video and knew that the officers had filed false reports in support of the false charges filed against Williams.

147.    At all times relevant, Defendant City of Pittsburgh knew that its officers had obtained a copy of the video but never reported its existence to the Command Staff. None of the officers who filed false reports and affidavits, etc. and/or who failed to disclose the existence of the video were ever punished or disciplined in any way.

148.    Officer Baker was the individual officer who filed the charges against Williams and the false Affidavit of Probable Cause. Instead of being punished, he was promoted to the rank of Sergeant in 2015.

149.    The on-scene supervisor of the individual officers involved, Stephen Matakavich, ordered his subordinates to get their "story straight" and failed to disclose the existence of the incriminating video to Command Staff. He was never punished or disciplined for such conduct.

150.    Officer Brendan Nee kicked Williams in the groin after he had been subdued and failed to include this information in any of his reports. Rather than disciplining him, his supervisors, directed him to file a "supplemental report" disclosing the kick - more than a year later, after Williams had filed a lawsuit. At that time Nee, for the first time, claimed

that he kicked Williams because he believed he had a gun.

151.     The officers made false allegations against Williams which were strikingly similar to the false allegations made by Defendants Martin and Burgunder against Plaintiff. No officer was ever disciplined, counselled or retrained or otherwise subjected to any adverse consequences from Defendant City of Pittsburgh as a result of their conduct toward Williams.

<u>Anthony Kenney v. City of Pittsburgh, et al</u>

152.     On December 10, 2012, Anthony Kenney was stopped by City of Pittsburgh police officers, removed from his car and hit repeatedly in the face and head by Officer Matthew Turko, including multiple strikes to the temple with a gun. His partner, Robert Smith watched this occur without intervening. Turko had no reason or justification for such force.

153.     Officers Turko and Smith prepared reports falsely alleging that the injuries sustained by Mr. Kenney were the result of extricating him from his vehicle, in the process of which he fell to the ground and struck his head.

154.     On July 16, 2014, a jury empaneled in the U.S. District Court for the Western District of Pennsylvania rejected the police officers' false allegations and specifically found that Turko had used excessive force and that Smith had failed to  intervene to prevent the use of such force.

155.     During the course of the trial, an independent, third-party witness testified that she observed the officers striking Mr. Kenney about the head and face as he

alleged.

156.    Despite the fact that an independent third-party witness corroborated Mr. Kenney's version of what occurred and despite the fact that a federal jury rejected the Defendant officers' false allegations, neither of the officers were ever disciplined. To the contrary, Turko was promoted to Sergeant on March 3, 2015.

157.    At all times relevant, Defendant City of Pittsburgh knew that Smith and Turko had filed false reports, knew that an independent witness contradicted their false version of the events, and knew that a federal jury had rejected their false allegations. Nevertheless, no action was taken against these officers. To the contrary, Turko was rewarded with a promotion less than nine months after the jury rendered its verdict against him.

Taylor Condarcure v. City of Pittsburgh, et al.

158.    On February 28, 2010, Taylor Condarcure was seriously injured when he was subjected to excessive force by Defendant Honick, who violently and unnecessarily punched him in the face. Defendant Honick, in order to justify this unlawful use of force, falsely charged Mr. Condarcure with serious criminal offenses, including felony aggravated assault on a police officer.

159.    Defendant Honick falsely alleged that the violent use of force was justified because Mr. Condarcure had aggressively shoved him when he refused to leave a nightclub upon Defendant Honick's command.

160.  Independent witnesses, unrelated  to Mr. Condarcure, reported, however, that Condarcure had not assaulted Defendant Honick as alleged. Prior to  trial,  the Allegheny County District Attorney's Office withdrew the aggravated assault charges with prejudice.

161.    Before the incident involving Taylor Condarcure, the City of Pittsburgh had received numerous complaints of Defendant Honick using excessive force, routinely followed by the filing of serious criminal charges to support such use of force.

162.    Former Chief Harper acknowledged in sworn testimony that the City of Pittsburgh was on notice of Defendant Honick's inappropriate use of force, specifically, delivering unnecessary and potentially deadly strikes to the face and head, and that action should have been taken to address it. No such action was ever taken.

163.    At all times relevant, although the City of Pittsburgh was on notice of Defendant Honick's excessive use of force, routinely followed by the filing of serious criminal charges to justify such force, and despite its knowledge that objective witness testimony contradicted his version of events involving Mr. Condarcure, Defendant City of Pittsburgh has never disciplined Defendant Honick for such conduct. To the contrary, Defendant Honick has been afforded preferred assignments and promotions, including secondary employment and assignments to SWAT.

<u>Christine Condarcure v. City of Pittsburgh, et al</u>

164.    Following Officer David Honick's use of excessive force against Taylor Condarcure, Taylor's mother, Christine Condarcure, filed a complaint against Defendant Honick with  the City of Pittsburgh Office of    Municipal Investigations ("OMI").  On May

6, 2010, City of Pittsburgh Police Officer Anthony Scarpine retaliated against Ms. Condarcure for filing this complaint by falsely charging her with resisting arrest and witness intimidation.

165.     In support of the charges, Scarpine filed a false Affidavit of Probable Cause containing numerous blatantly-false accusations against Ms. Condarcure. An OMI investigation uncovered surveillance video which demonstrated that the Affidavit of Probable Cause was untrue.

166.     In a subsequent lawsuit, additional evidence was disclosed confirming that the Affidavit of Probable Cause prepared by Officer Scarpine contained patently untrue allegations, and that Scarpine, who claimed to have personally  observed  what  was alleged in the Affidavit, was asleep when the alleged events occurred.

167.     Despite conclusive knowledge that one of its officers had filed a patently false Affidavit of Probable Cause, neither the City of Pittsburgh Bureau of Police, nor any police official, initiated criminal proceedings against the officer.

168.     Officer Scarpine continues to be employed by the Defendant City of Pittsburgh where he was allowed to choose to be assigned to the warrant office where one of his duties is to review criminal complaints for accuracy.

<u>Jordan Miles v. City of Pittsburgh, et al</u>

169.     On January 10, 2010, Jordan Miles, was severely beaten by three City of Pittsburgh police officers and falsely charged with serious criminal offenses including, but not limited to, aggravated assault on police  officers.

170.    In support of the false charges filed against Mr. Miles, the officers made allegations that he "bladed" his body, intentionally elbowed one of the officers in the head and donkey-kicked another officer in the shins.

171.    On March 31, 2014, a jury impaneled in the United States District Court for the Western District of Pennsylvania, unanimously rejected the officers' false version of events and found that the officers did not have probable cause to arrest Mr. Miles on the false charges filed against him, including the felony offense of aggravated assault on a police officer.

172.    Prior to the civil jury verdict on March 31, 2014, a district magistrate had dismissed the false criminal charges filed against Mr. Miles for lack of probable cause. Despite the fact that a federal civil jury rejected the Defendant officers' false allegations and found that Mr. Miles' arrest was without probable cause, and despite the fact that the district magistrate judge had thrown the charges out, none of the defendant officers were ever disciplined or punished.

173.    In addition, although not admitted into evidence at the time of trial, during discovery, it was disclosed that the defendant officers had engaged in similar conduct numerous times prior to the incident involving Mr. Miles. Despite this evidence, the defendant officers were never subjected to any discipline, retraining, counselling or other administrative action.

174.    In addition, although not admitted at the time of trial, a third-party witness reported that one of the defendant officers had used racial slurs to describe Mr. Miles, pointing to racial bias as the reason for beating Mr. Miles. Despite knowledge of these allegations, Defendant City of Pittsburgh made no effort to investigate or

25

otherwise address those allegations.

## Daniel Hacket v. City of Pittsburgh, et al

175.     On March 15, 2008, Daniel Hackett, a CPA, and an individual who had never been charged with or arrested for any criminal offense, was arrested by City of Pittsburgh Police Officer Edward Cunningham, tasered by that police officer, and subjected to serious false criminal charges, including misdemeanor resisting   arrest charges.

176.     Officer Cunningham made false allegations to justify his arrest of Mr. Hackett and the excessive and unnecessary use of a taser on Mr. Hackett.

177.     On December 4, 2008, Common Pleas Court Judge David Cashman found Mr. Hackett not guilty of the false criminal charges brought against him by Cunningham.

178.     Prior to the incident involving Mr. Hackett, the City of Pittsburgh had received other complaints concerning Cunningham's use of unnecessary and excessive force.

179.     Hackett subsequently filed civil lawsuit against the City of Pittsburgh and Cunningham, which the City of Pittsburgh settled for the sum of $155,000.00.

180.     Despite the fact that Cunningham's version of the events which he alleged to support the charges and the use of force was not credible, and despite the fact that Mr. Hackett was found not guilty, and despite a civil lawsuit which further exposed the lack of credibility in Cunningham's version of the events, Cunningham was never punished, disciplined, counseled or subject to any retraining. Instead, he was rewarded with

a  promotion to Sergeant following this incident and another to Lieutenant in February 2015.

<u>Collins v. City of Pittsburgh</u>

181.    On September 21, 2006, three City of Pittsburgh Police officers, in plain clothes and driving an unmarked vehicle, improperly initiated a vehicle pursuit of Jeffery Collins for allegedly "splitting lanes" with his motorcycle on Fifth Avenue in Oakland.

182.    During the course of the ensuing stop, the officers physically assaulted Collins, slapped him in the chest several times and then swept his legs out from under him while he was handcuffed, causing him to hit his head on a curb, lose consciousness and suffer a seizure.

183.    Collins spent several days in the ICU and required knee surgery as a result of the incident. Collins was charged with fleeing and eluding, DUI and several traffic offenses. The fleeing and eluding and DUI charges were dismissed. The traffic offenses were not pursued.

184.    During litigation of Collins' civil action, the   officers   gave   sworn testimony which directly contradicted the official incident report, contradicted each other's testimony, contradicted their own prior statements and was inconsistent with the injuries suffered by Collins.

185.    Despite conclusive and/or substantial evidence that these officers had violated Bureau policy, used excessive force and filed statements later contradicted by sworn testimony, the City of Pittsburgh did not prosecute, discipline, retrain, counsel or take any action whatsoever against these  officers.

Officer Bradley Walker

186.    The City of Pittsburgh Bureau of Police employed Police Officer Bradley
Walker from 1993 until 2010. During that time, Walker amassed over thirty documented
complaints of excessive force. These included, *inter alia*, numerous on and off-duty road
rage incidents, as well as allegations that he hit a man so hard that he lost the use of his
eye, beat a motorist in the head and placed a gun in his mouth, choked a pregnant women and
knelt on her back, hit a juvenile in the head with a gun and reported that the boy had
tripped, choked a woman, slammed her to the ground and sexually fondled and groped
her, broke a man's ankle by stomping on it during a routine traffic stop, choked his son
and beat his wife.

187.    Former Chief of Police, Nathan Harper knew that Walker had a pattern of
using excessive force, including choking and strikes to the head, and that his documented
uses of excessive force should have resulted in his termination. However, during his
seventeen years on the force, the highest level of discipline he received was a one-day
suspension.

188.    Defendant City Pittsburgh exhibited a pattern and practice of failing to
adequately investigate complaints about Walker, failing to keep a record of the
investigations it did conduct, failing to impose discipline when use of excessive force was
confirmed, and failing to follow through with and/or arbitrarily reducing the severity of
discipline of the rare occasions that it was ordered.

189.    In May of 2010, the Pennsylvania State Police criminally prosecuted
Walker for an off-duty road rage incident in which he sideswiped another motorist's car and then
went on a rampage choking the motorist, brandishing his firearm and threatening to shoot him,

punching the driver's side, windshield and roof of the motorist's car with his bare fist and gun (cracking the driver-side window and windshield) and waving his firearm and shouting obscenities at other motorists. After the Pennsylvania State Police charged Walker, he was terminated for "conduct unbecoming an officer."

190.    Despite knowledge of numerous previous incidents of misconduct and false reports to cover up this misconduct, Defendant City of Pittsburgh made no effort to criminally prosecute, terminate or even seriously discipline Walker until an independent agency stepped in and initiated criminal proceedings.

## STATEMENT OF RICO CASE

191.    This also is a RICO case brought pursuant to 18 U.S.C. §§ 1961-68. Plaintiff's Complaint is grounded on multiple violations of 18 U.S.C. §1511 (relating to the obstruction of State or local law enforcement), 18 U.S. §1512 (relating to tampering with a witness, victim, or an informant), 18 U.S. §1513 (relating to retaliating against a witness, victim, or an informant) which resulted in the violation of Plaintiff's federal civil and constitutional rights law that are embodied in the RICO statute prohibiting "schemes to defraud" where the fraud is "representational" or where the fraud amounts to "cheating and defrauding" without representations. This Complaint alleges violations of the aforesaid criminal provisions and federal civil and constitutional rights in both ways.

192.    The RICO enterprise alleged in this Complaint is the City of Pittsburgh Bureau of Police, an unincorporated association-in-fact composed of five (5) zone offices, numerous sub offices, numerous detective agencies and offices and comprising of approximately thirteen hundred (1300) police officers.  This association-in-fact enterprise

will be referred to as the "Police Enterprise" or the "Enterprise." The RICO Defendants conducting and participating, directly and/or indirectly, in the affairs of the City of Pittsburgh Police and the Fraternal Order of Police to injure and harm Plaintiff, and those similarly situated, committing the violations of numerous federal and state statutes as set forth herein above.

193.    Since at least the early 1980's (and possibly earlier) Defendants, utilizing the Enterprise, have engaged (and continue to engage) in unlawful and intentional schemes to (i) defraud Plaintiff, and others similarly situated, via misrepresentations and omissions (on which Plaintiff's, Defendants, the Police Officers, and/or other third parties justifiably relied(i), and (ii) defraud Plaintiff and others similarly situated, by allowing the schematic deprivation of their constitutional and civil rights by means of false or fraudulent pretenses—first subjecting Plaintiff, and other similarly situated, to Officers' excessive use of force, then covering up and concealing the excessive use of force in order to maintain Defendants' reputations and maintain and expand the promotion and profiting of these officers whereby officers and the Enterprise obtained (and continue to obtain) money, funds, credits, assets, and/or other property, and, in the process, cheating and defrauding Plaintiff, and others similarly situated, out of their liberty, innocence, families, jobs, finances, assets—in short, their lives. Defendants carried out these schemes to defraud through the Enterprise using the United States and international mail in violation of 18 U.S.C. §§ 1501, 1511 & 1512. Defendants also carried out these schemes to defraud through the Enterprise using electronic communications in violation of 18 U.S.C. § 1343.

194.    Defendants' schemes to defraud involved (and continue to involve) means of false or fraudulent pretenses and/or fraudulent and intentionally misleading

representations and omissions, including, *inter alia*, (i) Defendants and other police officers not named herein, making misrepresentations and false states resulting in the falsification of official police documents, including inter alia, police reports —through their words and deeds—failed to investigate crimes against Plaintiff's, that they were men of taking a vow to protect and serve the general public, with Plaintiff's, and those similarly situated, best interests at heart, and then, (i) knowing that Plaintiff, and those similarly situated relied on their representations and put their faith and trust in the City of Pittsburgh Bureau of Police as the protectors against those who commit crime and violate the public's constitutional rights, (ii) took advantage of their positions of power and influence and engaged in nefarious conduct and   abused Plaintiff, and those similarly situated Defendants in making misrepresentations relating to Plaintiff's, and those similarly situated, purported criminal activity, causing the arrest of Plaintiff based upon those false and fabricated statements and representation,  (iii) Defendants shifting the focus of the allegations to Plaintiff, and those similarly situated by painting Plaintiff, and those similarly situated,  as liars, alleging Plaintiff  committed crimes and that Plaintiff engaged in criminal and nefarious activity, that gave rise to the allegations of excessive use of force, and (iv) Defendants actively and fraudulently concealing the officers wrongful excessive use of force, among other things, (a) requesting that the officers not cooperate with investigating officers and agencies and affirmatively filing of false reports and acquiescence's in the officers' filing of false reports, and refusing to adequately investigate such allegations, (b) failing and refusing to terminate, or even discipline the officers, (c) promoting the abusive officers' within the City of Pittsburgh Bureau of Police, from parish to parish, without notifying the general public, thereby further facilitating and promoting

31

their abusive practices, (v) using all available means to look the other way, deny, obstruct the investigation of, and conceal the officers' use of excessive force. Defendants' wrongful acts are open-ended, ongoing, and continuous.

195.   As a direct and proximate result of Defendants' and other officers' above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy, *inter alia*, (i) Plaintiff, and those similarly situated, have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses and/or their property, (ii) Defendants have maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to expand) their membership with the Fraternal Order of Police and the employment with the City of Pittsburgh Bureau of Police. Defendants and the Enterprise continue to obtain money, funds, credits, assets and/or other property, and (iii) Defendants wrongfully shifted the risk, expense, and pain, and suffering of the abusive officers to Plaintiff, and those similarly situated, and robbed them of their liberty, freedom, innocence, families, jobs, finances, assets—in short, their lives. Defendants' schemes to defraud also amounted to a cheat against Plaintiff, and those similarly situated, Defendants intentionally engaged (and continue to engage) in these wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit, and to Plaintiff's, and those similarly situated, personal, mental, psychological, and financial detriment.

196.   Defendants' wrongful conduct also flagrantly violates other laws of the

32

United States, the common law of the states and federal common law.

197.   At all relevant times, by their wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, (i) Defendants conducted or participated in the affairs of the City of Pittsburgh, City of Pittsburgh Bureau of Police and the Fraternal Order of Police Enterprise—as described above—in violation of 18 U.S.C. § 1962(c)); and/or (ii) conspired to violate 18 U.S.C.§ 1962(c) (in violation of 18 U.S.C. § 1962(d)).

198.   Defendants agreed to commit, committed, and continue to commit these substantive RICO offenses (*i.e.*, the above-described unlawful and intentional schemes through the Enterprise) by engaging in multiple predicate acts of violations of Title 18 as set forth herein —all the while knowing of, and intentionally agreeing to, the overall wrongful objectives of their schemes. Defendants knew their conduct was wrongful, yet intentionally engaged in the above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to unlawfully cheat, defraud, and take unlawful and unfair advantage of Plaintiff and those similarly situated —and continue to do so.

199.   In addition to violating the RICO statute, Defendants' above-described unlawful and intentional schemes, actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute assault, breach of fiduciary duty, negligence/gross negligence, negligence *per se*, intentional infliction of emotional distress, wrongful death, public nuisance, conspiracy, and aiding and abetting.

200.    Plaintiff, therefore, seeks to recover from Defendants damages and compensation in the form of (i) compensatory damages (or, alternatively, restitution), (ii) economic damages, (iii) punitive damages, (iv) RICO treble damages, (v) pre-and post-judgment interest, and (vi) attorneys' fees, litigation expenses, and court costs, Plaintiff also seek declaratory and injunctive relief to compel Defendants to, *inter alia*, comply with various state statue requiring them to require the officers to cooperate with the investigators from Allegheny County District Attorney's Officer, Allegheny County Police, Federal Agencies or other investigating agencies, report abusive officers to law enforcement or other responsible authorities, terminate the abusive officers, identify the abusive officers to the general public so that public may be protected, release documents evidencing such officer use of excessive use of force in order to achieve transparency, and such other relief the Court deems just and proper.

**CAUSES OF ACTION**

**COUNT I**

**VIOLATIONS OF 18 U.S.C. § 1962(c)**

**Plaintiff v. All Defendants**
**Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the**
**Command Responsibility Doctrine**

201.    The preceding factual statements and allegations are incorporated by reference.

202.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c). Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

203.    The City of Pittsburgh is an  "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and, at all relevant times, were engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c).

204.    Defendants conducted and/or participated in the business and financial affairs of the Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c)—to wit, the above-described multiple, repeated, and continuous acts of violation of civil rights under 42 U.S.C. 1983 and Constitiutional Rights vested in Article IV, V, VIII of the United States Constitution used to devise, engage in, condone and/or ratify the above-described open-ended, unlawful, and intentional schemes to defraud the cheat Plaintiffs.

205.    Defendants' pattern of unlawful activity and corresponding violations of 18

U.S.C. § 1962 through the City of Pittsburgh directly and/or proximately caused Plaintiff to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c)—to wit, Plaintiff, and those similarly situated, were damaged (and will continue to be damaged) by Defendants engaging in the above-described repeated and systematic violation of civil rights under 42 U.S.C. 1983 and Constitutional Rights vested in Article IV, V, VIII of the United States Constitution. Under 42 U.S.C. 1983 and Constitutional Rights vested in Article IV, V, VIII of the United States Constitution.

206.    As a direct and proximate result of Defendants', and other officers not named herein, above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence through the through the City of Pittsburgh and the Fraternal Order of Police, *inter alia*, (i) Plaintiff, and those similarly situated, have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses, and/or their property, (ii) Defendants maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to maintain and expand) their commercial operations and union membership, whereby Defendants and the Enterprise obtained (and will continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants have wrongfully shifted the risk, expense, and pain, and suffering of the officers engaged in this nefarious conduct to Plaintiff, and those similarly situated, and robbed them of their freedom, liberty, innocence, families, jobs, finances, assets—in short, their lives. Defendants' schemes to defraud also amounted to a cheat against Plaintiffs and Class Members. Defendants intentionally engaged in these wrongful actions, inaction, omissions,

36

cover-up, deception, and concealment, obstructive behavior regarding investigations, and Class Members, personal, mental, psychological, and financial detriment—and continue to do so.

207.    Defendants knew or recklessly should have known the above-described unlawful and intentional schemes to defraud and to cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were fraudulent, misleading and illegal, and would cause Plaintiff, and those similarly situated, to suffer the above-referenced damages. All of Plaintiff's damages were reasonably foreseeable by Defendants and/or anticipated as a substantial factor and a natural consequence of their open-ended, ongoing, and continuous pattern of unlawful activity.

208.    Defendants' above-described unlawful and intentional schemes to defraud and to cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence violated (and continue to violate) 18 U.S.C. § 1962 by violating 18 U.S.C. §§ 1511, 1512 & 1513.

**COUNT II**

**VIOLATION OF 18 U.S.C. § 1962(d) BY
<u>CONSPIRING TO VIOLATE 18 U.S.C. §
1962(c)</u>**

**Plaintiff v. City of Pittsburgh & Fraternal Order of Police**
**Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the
Command Responsibility Doctrine**

209.    The preceding factual statements and allegations are incorporated by reference.

210.    Plaintiff and Class Members are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c). Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

211.    The City of Pittsburgh Fraternal Order of Police Enterprise  is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and, at all relevant times, were engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962.

212.    On information and belief, Defendants conspired with other persons and/or entities, the identities of whom are known only to Defendants at this time, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, Defendants and their co-conspirators conspired to conduct and/or participate in the business and financial affairs of the Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); and 1962(c)—to wit, the above-described open-ended, unlawful and fraudulent schemes to defraud and cheat Plaintiff and those similarly situated. Defendants and its co-conspirators intentionally participated in a conspiracy to engage in the above-described unlawful and intentional schemes, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit and to Plaintiff, and those similarly situated, personal, mental, psychological, and financial detriment—and continue to do so. The members, time, and place of this complex, multi-party conspiracy are known only by Defendants at this time and await discovery.

213.    The pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) engaged in by Defendants and their co-conspirators directly and/or proximately

caused Plaintiff, and those similarly situated, to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c)—to wit, Plaintiff was damaged (and will continue to be damaged) by Defendants conspiring to engage (and engaging) in the above- described repeated and systematic interstate and international mail and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, to devise, engage in, condone and/or ratify the above-described open- ended, unlawful and intentional schemes to defraud and cheat Plaintiff, and those similarly situated. As a direct and proximate result of Defendants' (and other officers not named herein) conspiracy to commit (and committing) the above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence through the Enterprise, *inter alia*, (i) Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses, and/or their property, (ii) Defendants maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to maintain and expand) their commercial operations in the United States whereby Defendants and the Enterprise obtained (and will continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants have wrongfully shifted the risk, expense, and pain, and suffering of the excessive use of force by officers and the falsification of police reports relating to the Plaintiff, and those similarly situated, and robbed them of their liberty, freedom, reputation, families, jobs, finances, assets. Defendants' schemes to defraud also amounted to a cheat against Plaintiff and those similarly situated. Defendants intentionally engaged in these wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit and to Plaintiffs, and those similarly situated, personal, mental,

psychological, and financial detriment—and continue to do so.

214.    Defendants knew or recklessly should have known that conspiring to engage in (and engaging in) the above-described unlawful and intentional schemes to defraud and to cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were fraudulent, misleading and illegal, and would cause Plaintiff, and those similarly situated, to suffer the above-referenced damages. All of Plaintiff's damages were reasonably foreseeable by Defendants and/or anticipated as a substantial factor and a natural consequence of their open-ended, ongoing, and continuous pattern of unlawful activity.

215.    Defendants' above-described unlawful and intentional schemes to conspire to defraud and to cheat, and commit the above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence violated (and continue to violate) 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) by way of 18 U.S.C. §§1511, 1512 & 1513.


**Count III**

**Zokaites v. City of Pittsburgh**

**(42 U.S.C. §1983)**

216.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

217.    Defendant City of Pittsburgh's conduct, as hereinbefore described, violated

Plaintiffs' 14th amendment substantive due process rights to be free from arbitrary, capricious, and deliberately indifferent conduct by a governmental entity and/or free from custom, policies, and practices amounting to the deliberate indifference to the violation of citizen's constitutional rights by police officers employed by the City of Pittsburgh. Plaintiff's 14th Amendment substantive due process claims are made actionable against the City of Pittsburgh pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C.§1983.

218.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendant, City of Pittsburgh, as hereinbefore described, Plaintiff suffered the following additional damages:

> a.    physical injuries in different parts of his body, including his face, head, neck, and back;
>
> b.    severe emotional distress, embarrassment, and humiliation;
>
> c.    loss of income and loss of employment opportunities;
>
> d.    loss of his Second Amendment rights to possess a firearm; and
>
> e.    attorneys' fees to defend against the false and malicious charges brought against him.

219.    Plaintiff also respectfully requests that this Court enter a mandatory injunction requiring the City of Pittsburgh to take immediate remedial action with respect to training and disciplining its police officers to act in accordance with the Constitutional and civil rights, privileges and immunities guaranteed to Ms. Robinson and all citizens of the United States of America by the Constitution of the United States of America and the Constitution and laws of

the Commonwealth of Pennsylvania generally and, specifically, that the City of Pittsburgh take immediate steps to develop a policy and educate its on-duty officers about the responsible use of alcohol while on duty and to refrain from conducting investigations while intoxicated.

220.    Plaintiff also respectfully requests that this Court enter a mandatory injunction requiring the City of Pittsburgh to take immediate remedial action with respect to training and disciplining its police officers to act in accordance with the Constitutional and civil rights, privileges and immunities guaranteed to Ms. Robinson and all citizens of the United States of America by the Constitution of the United States of America and the Constitution and laws of the Commonwealth of Pennsylvania generally and, specifically, that the City of Pittsburgh take immediate steps to develop a policy and educate its officers while on duty not to engage in excessive force and/or commit assaults on citizens who do not violate the law, file false criminal charges against citizens who do not violate the law, lie on affidavits of probable cause to cause the filing of charges against citizens who do not break the law.

**WHEREFORE**, Plaintiff requests judgment against the City of Pittsburgh for compensatory damages, attorney's fees and such other relief as the Court deems just and equitable under the circumstances.

Count IV

Zokaites v. Brian Martin and Brian Burgunder

(42 U.S.C. §1983)

221.    All preceding paragraphs are incorporated herein as if fully set forth.

222.    At all times relevant hereto, Defendants Martin and Burgunder were acting under color of state law individually and/or with the help of or in concert with others who were acting under color of state law. At all times relevant hereto, Defendants Burgunder and Martin deprived Plaintiff of the rights privileges and immunities secured to him by 42 U.S.C. §1983 and by the Fourth and Fourteenth Amendments to the United States Constitution by intending to cause and causing the prosecution of Plaintiff for violating 18 Pa.C.S.A. §§2702, 5501 and 903 on October 12, 2018 when Defendants Burgunder and Martin knew that Plaintiff did not violate those statutes on that day.

223.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Burgunder and Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

> a.    physical injuries in different parts of his body, including his face, head, neck, and back;
>
> b.    severe emotional distress, embarrassment, and humiliation;
>
> c.    loss of income and loss of employment opportunities;
>
> d.    loss of his Second Amendment rights to possess a firearm; and
>
> e.    attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against the Defendants Burgunder and Martin for compensatory, punitive damages and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

43

Case 2:19-cv-00216-CB Document 1 Filed 02/27/19 Page 44 of 52

Count V

<u>Zokaites v. Brian Martin</u>
<u>(42 U.S.C. §1983)</u>

224.    All preceding paragraphs are incorporated herein as if fully set forth.

225.    At all times relevant hereto, Defendant Martin was acting under color of state law individually and/or with the help of or in concert with others who were acting under color of state law. At all times relevant hereto, Defendant Martin deprived Plaintiff of the rights privileges and immunities secured to him by 42 U.S.C. §1983 and by the Fourth and Fourteenth Amendments to the United States Constitution to be free from the excessive use of force and the right to bodily integrity, preservation of personal security and the right to be free from physical assaults.

226.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

> a.    physical injuries in different parts of his body, including his face, head, neck, and back;

> b.    severe emotional distress, embarrassment, and humiliation;

> c.    loss of income and loss of employment opportunities;

> d.    loss of his Second Amendment rights to possess a firearm; and

> e.    attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against the Defendants for compensatory damages and punitive damages in a sum in excess of $75,000, and for the

recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VI

**Zokaites v. Defendant Police Officer**

*Malicious Prosecution and Willful Misconduct
under the Laws of the Commonwealth of Pennsylvania*

227.    Paragraphs 1 through 54 of this Third Amended Complaint are incorporated as if fully and completely set forth herein at length.

228.    At all times relevant to this action, BURGUNDER, MARTIN, LINCLON, HONICK were acting under the color of Pennsylvania state law.

229.    The Defendants were responsible for initiating criminal charges against ZOKIATES as follows:

a.    MARTIN, LINOCLN, HONICK and BURGUNDER provided false and misleading statement regarding ZOKIATES actions;

b.    BURGUNDER initiated the process of charging MICHAEL ZOKIATES with Aggravated Assault and other charges when he falsely accused MICHAEL ZOKIATES of "punching" LINCOLN and MARTIN; and

c.    BURGUNDER continued the criminal process by falsely and without any probable cause, issued a baseless criminal complaint charging MICHAEL ZOKIATES with Riot, Aggravated Assault and Conspiracy and provided a false sworn Affidavit of Probable Cause resulting in the issuance of a warrant against MICHAEL ZOKIATES.

230.    The charges filed against MICHAEL ZOKIATES were withdrawn by the Allegheny County District Attorney's Office prior to the preliminary hearing determining that the charges were unwarranted and baseless.

231.    The charges against MICHAEL ZOKIATES were initiated without probable cause, as evidenced by the security video, which clearly shows that MICHAEL ZOKIATES did not assault any Pittsburg Police Officer, but that City of Pittsburgh Police Officers, inter alia, Defendant BURGUNDER, assaulted MICHAEL ZOKIATES.

232.    BURGUNDER is charged with the duty of knowing and understanding the basic elements of the law he is presumably enforcing – namely aggravated assault upon a police official.

233.    The elements of the crime of aggravated assault are clearly established and it is clear that MICHAEL ZOKIATES committed no crime.

234.    It is believed and therefore averred that the charges against MICHAEL ZOKIATES were initiated for the purpose of attempting to shift the blame away from the Defendants' conduct and in order to justify Defendants' assault upon MICHAEL ZOKIATES.

235.    Each defendant named in this count viewed the security video, which clearly exonerates MICHAEL ZOKIATES for the conduct he was accused of in the criminal charges, before the charges were filed.

236.    Defendants' actions were willful, wanton, malicious or reckless warranting an awarding of punitive damages.

237.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Martin and Burgunder, as hereinbefore described, Plaintiff suffered the following additional damages:

> a.      physical injuries in different parts of his body, including his face, head, neck, and back;

b.      severe emotional distress, embarrassment, and humiliation;

c.      loss of income and loss of employment opportunities;

d.      loss of his Second Amendment rights to possess a firearm; and

e.      attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against the Defendants Burgunder and Martin for compensatory damages and punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VII

Zokaites v. Burgunder

***False Arrest & False Imprisonment***

238.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

239.    Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights to be free from false arrest and false imprisonment

240.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a.      physical injuries in different parts of his body,

including his face, head, neck, and back;

b.      severe emotional distress, embarrassment, and humiliation;

c.      loss of income and loss of employment opportunities;

d.      loss of his Second Amendment rights to possess a firearm; and

e.      attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against Defendant Burgunder for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VIII

<u>Zokaites v. Martin</u>

***Assault and Battery***

241.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

242.    Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights and constituted assault and battery.

243.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

48

a.      physical injuries in different parts of his body, including his face, head, neck, and back;

b.      severe emotional distress, embarrassment, and humiliation;

c.      loss of income and loss of employment opportunities;

d.      loss of his Second Amendment rights to possess a firearm; and

e.      attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against Defendant Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count IX

Zokaites v. Martin

***Intentional Infliction of Emotional Distress***

244.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

245.    Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights and constituted intentional infliction of emotional distress.

246.    In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional

damages:

>
> a.    physical injuries in different parts of his body, including his face, head, neck, and back;
>
> b.    severe emotional distress, embarrassment, and humiliation;
>
> c.    loss of income and loss of employment opportunities;
>
> d.    loss of his Second Amendment rights to possess a firearm; and
>
> e.    attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against Defendant Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count X

Zokaites v. All Defendants

***Civil Conspiracy Under State Law***

247.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

248.    Defendants Martin, Burgunder, Honick and Lincoln conspired with each other to commit malicious prosecution, false arrest, assault and battery and intentional infliction of emotional distress as hereinbefore described.

249.    The conduct of Defendants Martin, Burgunder, Honick and Lincoln, as

hereinbefore described, was outrageous and it constitutes common law/Pennsylvania state court civil conspiracy.

250.   In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Martin, Burgunder, Honick and Lincoln as hereinbefore described, Plaintiff suffered the following additional damages:

a.   physical injuries in different parts of his body, including his face, head, neck, and back;

b.   severe emotional distress, embarrassment, and humiliation;

c.   loss of income and loss of employment opportunities;

d.   loss of his Second Amendment rights to possess a firearm; and

e.   attorneys' fees to defend against the false and malicious charges brought against him.

**WHEREFORE**, Plaintiff requests judgment against Defendants Martin, Honick, Burgunder and Lincoln for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of any and all issues triable of right by trial by jury pursuant to the Seventh Amendment to the United States Constitution, the statutes of the United States of America and Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

_____/s/ *Wendy L. Williams*
Wendy L. Williams, Esquire
Pa. I.D. No. 69182

Frick Building
437 Grant Street
Suite 417
Pittsburgh, PA 15219
(412) 434-5757

Attorney for Plaintiff
MICHAEL ZOKAITES